18-4081 and 18-4099. Council, you may proceed. Thank you, Your Honor. Council, I am Daphne O'Brien, and I am here on behalf of Mr. Porter. Two critical substantive problems exist in this case. First, there was insufficient evidence to establish that Mr. Porter, the defendant, acted because of Mr. Waldvogel's race. Second, there's a very real possibility that the jury convicted Mr. Porter based upon his actions toward Mr. Waldvogel's child, even though he was indicted for his actions toward Mr. Waldvogel himself. This is a constitutional error. With regard to the sufficiency of the evidence, maybe the best way to look at this is to look at the government's best evidence, to marshal their best evidence, and then compare it to the cases cited by both parties relating to the same statute. If we look at the government's best evidence, they have a statement that was made a year after this incident where Mr. Porter guesses that Mr. Waldvogel might be half black. It's better than that. He doesn't guess. I wondered that myself, and so I watched the video, and my concern was that the law enforcement would have approached him and said, well, you think that the young boy is African American, so isn't the father probably, too? That would have been one thing, but that's not how it went down in that interview. It's just the defendant acknowledging and saying that the father is, I think he says, half Negro. And so there's no prompting. That's in his head. It's not something that he figured out in a year. That's correct, Your Honor. There is no prompting, and I believe what he actually says is that he looks white, but he's probably half Negro. Those are the words, if I remember correctly, Your Honor. And this, though, has extremely limited evidentiary significance in the sense that it was a year after Mr. Porter was involved in this incident, and as an aside, Your Honor, it was also after a state case on exactly the same issue. Paragraph 52 in the pre-sentence report references he was charged in the state system with aggravated assault based on this same event. In addition to that state... How does that relate to whether he perceived the victim as African American? It could inform his thoughts a year later, Your Honor, as opposed to his thoughts at the moment. Mr. Porter was an unabashed, very vocal racist, as is clear from the record. And yet, at the time of this assault, he never commented on Mr. Waldvogel's race. He certainly did to his son. Presumably, he would have to Mr. Waldvogel if he had any belief or any indication that he was African American, Your Honor. Well, what inference should we draw, just genealogy, I mean, just from a normal, you know, knowledge of genetics, that if he thought the son was Negro or black, isn't that some proof that he thought the father was Negro or black? With the makeup of modern families and the frequency of adoptions and things like that, Your Honor, no, especially in light of the fact that not one witness observed Mr. Waldvogel as African American. The neighbor, the apartment workers, they all believed him to be Latin American, which can go to inform Mr. Porter's belief. So let's take that for just a moment, then. Do you win if he was thinking he was Latin American because there was no evidence that the defendant was prejudiced against Latin Americans, against Hispanics? It would certainly make the government's case that this is because of race much more difficult. Why? Because that could be race, too, couldn't it? Absolutely, Your Honor, but they were focusing on the background evidence of Mr. Porter's animus toward African Americans. So are you saying that that would have required a variance from the allegation? Did the allegation say black? Yes, Your Honor. So was it an indictment or an information in this case? An indictment, Your Honor, and it specified... So the indictment said you were biased because he was black. That is correct, Your Honor. And therefore, it would have been a variance and impermissible to prove that indictment simply if the government now tries to rely on the fact that he had an animus against him because he was Hispanic. That's correct, and there's also a lack of evidence that he did have animus toward the Hispanic race, Your Honor. Because he kept saying, you're black, son. Correct. But when the cops came, didn't he... You dismissed this other racial statement because it was a year later, but right at that moment when the cops came, wasn't he arranging the cops because he was accusing them of being black lovers? Yes, Your Honor, he was. That is not an indication, though, of how he was responding to Mr. Waldvogel because even in that moment, he wasn't speaking of Mr. Waldvogel as black or as African American. He knew that he was being arrested for what he had done to Mr. Waldvogel. Or to his son, Your Honor. No, he knew he was being arrested. I assume, I mean, certainly the jury could have found that he knew it was because he had stun gunned Mr. Waldvogel. So then he says when the cops come to arrest him for that event, well, that's terrible, you guys. You're arresting me but you're just racist. So isn't that some evidence? Your Honor, at the time of Mr. Porter's arrest, he talks about why he was being arrested and I think gives the best information about what he thought and what he knew. And he says it was because he had racially maligned this child, even at that time. So that statement Did he specifically mention the child, though, to the police? What did he say exactly? He talked about how the child kept riding his scooter around the apartment complex and how he had used a racial slur against the child and he said, I probably shouldn't have done that. Or something along those lines. That is what was big in Mr. Porter's mind. He didn't attack the child. I'm sorry? He didn't attack the child. No, he didn't attack the child. And wouldn't it be a fair inference that he knew the police were there because he actually had attacked someone and it wasn't the child? Yes, Your Honor. I think that is a fair inference. But it's not a fair inference to think that he attacked Mr. Waldvogel because of Mr. Waldvogel's race in that moment. Why wouldn't it be given the statement that he made? If it's a fair inference that they're there for his attack on Mr. Waldvogel and he makes the racist statement, then why wouldn't that relate to the attack on Mr. Waldvogel? That statement is not tied to Mr. Waldvogel on its face. So we're making an inference, we're making a jump to say that it's tied to Mr. Waldvogel. I said an inference. But the statement very easily covers Mr. Waldvogel as a general statement, doesn't it? Where Mr. Porter never had any indication of belief that Mr. Waldvogel was a racist and Mr. Waldvogel was black, short of that statement, which may or may not have related to Mr. Waldvogel at all, and a statement a year after the fact, I don't know that that is a fair inference, Your Honor. This is something I hadn't understood. Are you saying that even if the defendant perceived that the father was half black, that the government still has not proved its case? No, I'm not saying that. If there was sufficient evidence that Mr. Porter believed Mr. Waldvogel to be half black and that he attacked Mr. Waldvogel because of that, then the government has proved their case. So you concede that if he perceived that he was half black, the attack was because he was half black? No. The attack would still have to be because of his race. If Mr. Waldvogel were half black and Mr. Porter believed that, but the attack wasn't because of that, then the government still hasn't met its burden, because that's what the statute requires, and that's part of the problem here. Let me make sure I understand your position on this point. If the court found that the defendant indeed did, at the time, believe that the father was half black, game over for you? No. So why? Because the statute requires that the government prove that Mr. Porter acted because of that belief, Your Honor, and that's where their proof fails. And you're saying he acted for another reason, namely that the father was challenging him as far as his statements to the son? That is correct, Your Honor. Mr. Porter stood on an enclosed porch. He didn't go seek out Mr. Waldvogel. Mr. Waldvogel approached him, went two feet away from his porch, and confronted him about the statement that Mr. Porter made toward his child. So you're saying that if the seven-year-old boy had been, were 100 percent black, and the father had adopted him and was 100 percent Nordic, that you would or would not . . . that you're saying in that instance, no conviction, nothing would satisfy. I'm saying, Your Honor, that Mr. Porter would have acted exactly the same. What if the father were 100 percent black? Then would you concede the conviction in this instance or . . . No, Your Honor. Have you made that argument? I didn't understand that from your brief. Yes, Your Honor, that there's insufficient evidence that he acted because of Mr. Waldvogel's race. That's the entire crux of the sufficiency of the evidence. So the jury found that, though. The jury instructions were very clear. So the jury made that finding against your client. That's correct. So your argument is that, yeah, I know the jury did that, but they were absolutely taking all the inferences and assumptions, not assumptions, but inferences. There was no evidence to support that finding. Insufficient evidence to support it. Yes, Your Honor. If you look at the cases . . . Could I just . . . Yes. Since we're . . . Please. The clock's moving. I just want to ask about your second issue. I had a . . . I was having a hard time understanding that one because how could the jury have possibly convicted Mr. Porter for using force against the son when there wasn't any evidence that Mr. Porter used or attempted to use force against the son? Your Honor, that's not what the elements or what the statute requires. Well, but I don't understand your argument to be about the statute so much as an argument that by virtue of the way the evidence was presented and the closing argument was made, that somehow the jury was punishing Mr. Porter for something that Mr. Porter did not do. To Mr. Waldvogel, but to Mr. Waldvogel's son, but he didn't do anything to Mr. Waldvogel's son. The evidence wasn't there to support your argument. Your Honor, the elements of the statute, if the court looks at volume number one, pages 144 to 145, that's jury instruction 15. Element number one talks about the defendant using the force or threat of force, but doesn't specify who that force or threat of force has to be used against. I'm not talking about that. I'm talking about the evidence and the government didn't put on evidence that he had used force against the son. The threat of force, though, is... Is there any evidence that he threatened the son? When he told... That isn't a hard question. Is there any evidence? Yes, Your Honor. What is the evidence? The evidence is when he told the son and the father, you and your N-word son, get out of here. That could be considered an implicit threat, Your Honor. In fact, there's a case cited in the brief, in our brief, the Gilbert case, where the court found... He didn't touch the son. No. It would be based on threat of force, not actual force. But he did hit the father. Yes. All right. One last question about that. How could that not have been an aggravated assault? Your Honor, the government's argument with regard to aggravated assault rests on essentially the fact that the jury found that there was a dangerous weapon, and on assumptions about how that weapon was designed. The fact that it's a dangerous weapon alone, though, that it's capable of causing death or serious bodily injury doesn't mean that Mr. Porter intended to cause death or serious bodily injury, or bodily injury at all. Those are two different inquiries. So this is an intent argument, then? Yes. Yes. And if dangerous weapon... It left a mark on his neck. It knocked him to his knees. How can you say that he didn't intend to cause a bodily injury of some sort? There's a photograph in the record. The jury never found even bodily injury, Your Honor, let alone intent to cause bodily injury. We're talking guidelines. I'm sorry? We're talking guidelines on the aggravated assault. No, I understand that. So the jury doesn't have to find that. It's simply a preponderance for the court. There is also some contrary evidence that came out in trial with regard to whether the cane even impacted Mr. Waldvogel's neck, Your Honor. There's a photograph in the record. There was a photograph in the record, but there was also a statement of the neighbor saying that she couldn't see it connect. She told that to the police officer at the time, and there was a statement by a juvenile witness that was referenced in the pre-sentence report where she said she never saw that Mr. Waldvogel was hit by the cane at all. If the judge has a choice between two competing options and they're both reasonable, then on an abuse of discretion standard, it can't be wrong for the judge to choose option B, even if I or this court would have chosen option A. One quick follow-up. For the guideline and in applying aggravated assault, what aggravated assault do we apply? Is it the state of Utah's? Is it the federal definition? For the guidelines, it would be the federal definition in the guideline. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the court, Max Laportosa, on behalf of the United States as appellee and cross-appellant. Can I just ask you right off the bat, do you concede that the indictment is poorly done? That if you did it again, you wouldn't charge it in this sort of language with African-American man, for all intents and purposes, being an element? The phrase African-American is used in the indictment is not an element of the offense. The government is not required to prove Porter's, I'm sorry, Mr. Waldvogel's actual race. Well, typically you don't put non-elements in an indictment and just add things for fun. And what this says is the defendant here ended by force and threat of force, willfully injure, intimidate and interfere with, and attempt to injure, so forth, with M.W., an African-American man. And he identified as an African-American in his testimony, but his actual race is not an element of this crime or other hate crimes. Shouldn't the indictment just say that the defendant perceived him as African-American and therefore intimidated and so forth? I think it could have said that, Your Honor, but as this Court ruled in Smith, a case we cited in our brief, indictments sometimes have additional language that is there for informational purposes. If it is not part of the elements, the government is not required to prove that simply by virtue of being in the indictment. All right. Would you do it the same way again tomorrow? I can't. I wasn't the U.S. Attorney who charged me. Well, but you work for the office. Would you charge this the same way again tomorrow? And if not, why not? I think we would charge it the same way because there was sufficient evidence in this record to show that Porter attacked Mr. Waldvogel because of his race or color. And viewing the evidence in the light most favorable to the government, it cannot credibly be argued on this record, in looking at the totality of this evidence, that no reasonable juror could have found that Porter attacked Mr. Waldvogel due to his race or color. And that evidence includes, in terms of Porter's perception of Mr. Waldvogel as not white or as somebody of a different race, his neighbor, Caitlin Adair, testified that she believed that Mr. Waldvogel didn't look white, and on that basis believed that Porter might lash out or become violent against Mr. Waldvogel, and that is what happened here. Second, the jury saw Mr. Waldvogel testify, and the jury could assess how they thought Mr. Porter would have perceived Mr. Waldvogel and his race or color. Third, right after the attack, when the local police arrested Mr. Porter, he used a racial epithet that indicates, as this court indicated, that Mr. Porter perceived Mr. Waldvogel as African-American and was angry. Well, I'm not sure it does. I thought the statement was something more general, that you're just concerned. I guess he called the cops nigger lovers. Correct. But that doesn't, I mean, that statement could have related to his animus that he believed the cops were coming. Even though he assaulted the father, they were coming to protect the son. So I don't think that statement really does indicate his intent that he believed the father was a black. Yes, but to overturn the conviction on that basis, this court would have to find not only that that was one plausible reading, but that no reasonable juror could have found that that statement wasn't a direct reference to Mr. Waldvogel. And I would submit that given that he was being arrested for the attack, that Mr. Waldvogel had told Mr. Porter that he'd be calling the police immediately beforehand, that that's the most logical reading of that statement. And then fourth, when Mr. Waldvogel, I'm sorry, when Mr. Porter was arrested in Arizona, he twice admitted on the body cam tapes, unprompted, that he thought Mr. Waldvogel was, in his words, half nigger. It is true that in one of those tapes. Could I just ask you, OK, you've given your summary of the evidence, and we heard your opposing counsel give what she thought was the relevant evidence. What have you identified that she didn't identify as evidence going to this issue? Is it just the jury's ability to observe the victim, or is there anything else? Are we operating on the same page, both sides at this point, or is there something that you're adding? I think the major difference between the government's position and defendant's position is that, consistent with the case law, we're looking at the totality of the evidence. In other words, could a reasonable jury have looked at all of this evidence and concluded that Porter attacked Mr. Waldvogel because of his race or color? I think what the defendants are doing is trying to isolate these statements, such as the statement that Mr. Porter made during the attack when he said, you and your n-word son can get out of here. This court has not required a smoking gun for the jury to infer intent. The jury can infer intent through the totality of the evidence and through the defendant's surrounding comment. Well, counsel, I understand the totality of the evidence point you're making. I'm just trying to understand if the two totalities each of you have sketched out are the same, or are you giving us more than what we heard from the appellant? Let me raise one point that I don't believe the defendant has raised. In the body cam tape that Judge Phillips referred to where Mr. Porter says that Mr. Waldvogel was probably half Negro and his sons were 100%, which I believe leads to the inference from a reasonable jury that he was concluding that Porter was at least part African American because his son was. But then Porter goes on to say, and I don't want anything to do with any of them. I told them at the complex. I don't want anything to do, I don't want to live near any of them. And I think that belies any claim by the defendant that he was distinguishing between Mr. Porter's, Mr. Waldvogel's son and Mr. Waldvogel himself in terms of his racial animus. The any of them is when he first met with the property manager, he was very explicit. Who's going to be living upstairs? It better not be and fill in the blank. That's correct. And so to say that that means the father and the son both, I think. Well, I'm not referring to what he said to the property manager before the attack. What I'm referring to is what he said to the officers in Arizona after the attack. He said right after he said that he thought Mr. Waldvogel was half Negro and then he said he thought his kids were 100% African American. He then said, I don't want anything to do with any of them. So, in other words, he didn't distinguish between Mr. Porter, Mr. Waldvogel and Lucas Waldvogel with respect to his animus. He held animus against both of them. And that, I submit, allows a reasonable jury to conclude that Porter attacked Mr. Waldvogel based on his race or color, even if he had other biases, even if he had other concurrent reasons for doing so, such as a bias against his son. Let's assume that the video is good enough to show that the defendant perceived the father as half black. Your opposing counsel says that's not good enough because you can attack half black people for some reason other than race. And here he's gotten himself in a confrontation. And here comes the father. And he reaches out with his zapping cane and zaps him in the neck. That doesn't have to be because he's half black, does it? It doesn't have to be. It could be a concurrent reason for doing so, as long as the jury could reasonably conclude that Mr. Waldvogel's race or color caused the attack. And there was sufficient evidence for that here. In other words, to overturn on that basis, this Court would need to conclude that based on this record, no reasonable juror could come to that conclusion, that a reasonable juror could only come to the conclusion that the only reason that he attacked Mr. Waldvogel was not his race or color, but because of his son or because of these problems that he alleged to have had with confrontation, which were not presented in the record. They were mostly presented in sentencing. Well, we heard the phrase because of a lot in the previous argument. And we're also hearing from you the phrase, could a reasonable jury, but could a reasonable jury find the rest of the standard is beyond a reasonable doubt? Why is that standard met? Again, it's met here not based on one piece of evidence, but putting it all together. The statements he made before, during, and after the attack. The fact that he showed no repentance after the attack. He said nothing to indicate that this was a mistake, that this was not a race-based attack. He was defiant. He said, I am the cops. He used a racial empathetic against the arresting officers. The fact that we also have surrounding evidence of bias that is not just generalized bias against African Americans, but calls for violence against African Americans. So he has said, for example, that Hitler should have gassed all African Americans. When he was being transported back to Utah, he said, if you put an African American in my cell, I may have to kill you. Well, but aren't we now kind of moving into the general animus evidence that I think the defense has conceded that that evidence was there. That really isn't the argument. The argument is, was the attack because of Mr. Waldvogel being African American? Again, I think that is part of the evidence. And especially the fact that he was actually calling for violence. It was not just generalized bias against a racial group. The jury could have concluded that he was acting on those violent ideations when he attacked Mr. Waldvogel. That would be a reasonable conclusion. If the court would permit me, I'd like to turn to the issues on our cross-appeal on aggravated assault. Unless we have any other questions about? Okay, I have a question on that. On the aggravated assault, do you agree that it is an intent issue that the district court didn't go with the aggravated assault because it didn't make a finding that he acted with intent? I agree. Serious bodily injuries. That's what the district court did. Yeah, I agree. The district court. All right. So it's the intent issue. And for you to succeed on that issue, you'd have to show that that finding was clear error, correct? That is correct. All right. How are you going to do that? And here's why it's clear error. Here's why it's the only conclusion supported by this record. A dangerous weapon, such as Porter's stun cane, is by definition capable of causing death or serious bodily injury if it is used in the manner in which it is designed to be used. Do you need serious bodily injury? And what standard are we applying here? Is it Utah aggravated assault? Under the sentencing guidelines, he had to have intended to cause bodily injury. But a dangerous weapon is one, under the sentencing guidelines, that is capable of causing serious bodily injury. Okay. So all we need is bodily injury. That's correct. That's correct. And by Utah aggravated assault? And this is not committed in the territorial limits of the United States. Well, I believe both parties have applied the definitions of the sentencing guidelines, and I believe the court applied the definitions of the sentencing guidelines. The definition of? You mean, I understand you can have an aggravated assault in federal territory that you then use the sentencing guidelines to apply that. But we don't have that here. Don't we use Utah aggravated assault? And what does it say about intent? I can't answer that, Your Honor. The court, the district court was operating under the, and the probation office, when it made its recommendation, was operating under the sentencing guidelines definition of aggravated assault, which is an assault that involves the use of a dangerous weapon and an intent to cause bodily injury. And that was the definition that we've been operating under. Can I switch, if there are problems with aggravated assault, could there have been error about the court not giving a sentence under the alternative of 2H1.1, which says, 3, which says that the base offense level should be 10 if there was the use or threat of force against the person. That is correct. So that's the floor. There can hardly be any doubt that there was a use of force, regardless of his intent. And so if you had started with that, then you would have ended up with a sentencing range that was 6 or 7 or 8 months. Instead of 6 to 12 months, it would have been 12 to 18. And that range would have had to have been varied from or departed from, I guess varied from, to support the sentence that was given. And I guess there's always an assumption that courts, district courts, are reluctant to vary from a guideline range so that that might suggest that there was error there. So I guess my question is, did you argue to the district court that the sentence should be under 2H1.1A3 as an alternative? Yes, we did. And are you arguing now that that is an independent grounds for arguing that it ought to go back for resentencing? We are. And would that approach, at least, would get around the concern about whether there was intent to use force and to do serious injury or not, because it would only involve simply the use of force, which there can hardly be any doubt at all. Well, remand clearly has to occur on the error of not applying a base offense level of 10, because the statute tracks the language of the sentencing guidelines, as Your Honor recognized. Our position on aggravated assault is that, I mean, the court may disagree with us on this, and remand would still be appropriate, but that there was no other conclusion in this record based on how Mr. Porter attacked Mr. Waldfogel, but to infer that there was an intent to cause bodily injury. But that requires an abusive discretion finding. We have to say that there was no way this district court could have avoided the conclusion that there was an intent to cause serious bodily injury. And there are witnesses that said, look, it was just chaotic. It was things moving around, arms and legs everywhere. And, I mean, it's a little hard for me to say on this record that the district court just was clearly erroneous in declining to find an intent here. But I don't think that there's any way that you could say that there was no use of force. And so I think at that point we could say, at least under 2H1.183, that there was error. You should go back and rescind. It's under that provision. Is there any procedural reason why that approach could not be used here? No, there is no procedural reason why that approach could not be used. But you don't like it because that's not high enough? We believe that on your first, I agree with your second point, Your Honor. I disagree respectfully with the first point. Because we believe that on this record, and including the out-of-court statement that is cited in the probation report, there is no other evidence to undermine the conclusion that Porter was intending to cause bodily injury to Waldfogel. When you conceal a stun cane behind your leg, and then you lift it up, and then you press a button, and you activate the shock device on that stun cane, which is what makes it a dangerous weapon, and then you apply it, you strike your victim, and then you apply it against the victim's bare skin, that is akin to if I took a gun, and maybe I took a fake gun, or maybe I took an unloaded gun and I aimed it at somebody, and in that case, maybe I'm simply trying to frighten the person, but if I load the gun, I shoot it, and I miss or I graze my victim, it's still clear that I was intending to cause bodily injury, and maybe I'm just a bad shot. I see my time is up, Your Honors. Thank you, counsel. Counsel, I'm going to ask, do we owe Ms. Oberg any? Sorry about that. I'd like to thank both counsel for your arguments this morning. The case will be submitted, and counsel are excused.